ORAL ARGUMENT NOT YET SCHEDULED

Docket No. 25-7017

# IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

PhantomALERT, Inc.,

*Plaintiff-Appellant*,

v.

Apple, Inc.,

*Defendant-Appellee.*

Interlocutory Appeal from the United States District Court for the
District of Columbia,
Honorable Judge Trevor N. McFadden, No. 1:24-cv-00786

# CORRECTED BRIEF OF *AMICI CURIAE* PROFESSOR ERIC A. POSNER AND THE AMERICAN ANTITRUST INSTITUTE IN SUPPORT OF APPELLANT PHANTOMALERT, INC.

Deborah A. Elman
Bruce E. Gerstein
GARWIN GERSTEIN & FISHER LLP
88 Pine Street, Suite 2810
New York, NY 10005
T (212) 398-0055
delman@garwingerstein.com
bgerstein@garwingerstein.com

*Counsel for* Amici Curiae *Professor Eric A. Posner and the American Antitrust Institute*

July 23, 2025

## CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), *amici curiae* certify as follows:

### A.     Parties and *Amici Curiae*

Except for the following, all parties, intervenors, and *amici* appearing before the district court and in this court are listed in the Brief for PhantomALERT, Inc.:

> Professor Eric A. Posner, Kirkland & Ellis Distinguished Service Professor, University of Chicago Law School
>
> The American Antitrust Institute

### B.     Rulings Under Review

References to the rulings at issue appear in the Brief for PhantomALERT, Inc.

### C.     Related Cases

The case now pending before this Court was not previously before this Court or any other court. Counsel is not aware of any related case pending before this Court or any court.

/s/ *Deborah A. Elman*
Deborah A. Elman

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amici curiae* state that Professor Posner is an individual and therefore does not issue stock or have a parent corporation, and the American Antitrust Institute is a nonprofit, non-stock corporation; it has no parent corporations, and no publicly traded corporations have an ownership interest in it.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES..................i

CORPORATE DISCLOSURE STATEMENT.....................................................ii

TABLE OF CONTENTS ...............................................................................iii

TABLE OF AUTHORITIES ......................................................................... iv

IDENTITIES AND INTEREST OF *AMICI CURIAE*................................... 1

STATEMENT OF AUTHORSHIP AND CONSENT................................... 2

SUMMARY OF ARGUMENT ..................................................................... 2

ARGUMENT ............................................................................................. 4

    I.     THE FOREMARKET THEORY .................................................. 6

    II.    THE LOCK-IN THEORY.......................................................... 9

    III.   WHY IT MAKES NO SENSE TO COMBINE THE THEORES.......... 11

CONCLUSION ....................................................................................... 13

CERTIFICATE REGARDING SEPARATE BRIEF

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

CASES

*Eastman Kodak Co. v. Image Tech. Servs.*
504 U.S. 451 (1992) ........................................................3, 5, 9, 10, 11, 12, 13

*Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023) ...........................................................3, 9, 11, 12

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
466 U.S. 2 (1984) .......................................................................................... 7

*Lambrix v. Tesla, Inc.*,
737 F. Supp. 3d 822 (N.D. Cal. 2024).....................................................8-9


STATUTES

15 U.S.C. § 1..............................................................................................4, 5

15 U.S.C. § 2.........................................................................................2, 4, 5, 6


OTHER AUTHORITIES

Patrick Rey & Jean Tirole, *A Primer on Foreclosure*,
3 Handbook of Industrial Organization ch. 33 (Armstrong
& Porter, eds. 2007)....................................................................................... 7

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An
Analysis of Antitrust Principles and Their Application* (2025)...................... 4, 5, 7

Steven C. Salop, *The First Principles Approach,
Kodak, and Antitrust at the Millennium*, 68 Antitrust L.J. 187 (2000).......................... 10

## IDENTITIES AND INTEREST OF *AMICI CURIAE*

*Amicus* Professor Posner has researched and published widely on antitrust law and economics. His sole interest in this case is to ensure that section 2 of the Sherman Act continues to serve the public interest by preventing harmful monopolization. He writes because this Court should not depart from the Sherman Act's statutory text and applicable Supreme Court precedent, which reflect sound policy reasons and align with modern economics.

*Amicus* the American Antitrust Institute (AAI) is an independent nonprofit organization devoted to promoting competition that protects consumers, businesses, and society. It serves the public through research, education, and advocacy on the benefits of competition and the use of antitrust enforcement as a vital component of national and international competition policy. AAI enjoys the input of an Advisory Board that consists of over 130 prominent antitrust lawyers, law professors, economists, and business leaders. *See* http://www.antitrustinstitute.org.[1]

---

[1] Individual views of members of AAI's Board of Directors or Advisory Board may differ from AAI's positions.

## STATEMENT OF AUTHORSHIP AND CONSENT

Pursuant to Fed. R. App. P. 29(a)(4)(E), *amici* declare that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund preparing or submitting the brief; and no person other than the *amici*, its members, or its counsel contributed money that was intended to fund preparing or submitting this brief. Apple, Inc. consents to *Amici Curiae* filing this brief.

## SUMMARY OF ARGUMENT

In the proceedings below, the district court made a simple legal error, but one that, if left uncorrected and followed by other courts, will reduce liability for monopolists who use their market power over one product to monopolize the aftermarket for that product. The error will introduce confusion into the legal treatment of a large group of important cases, many of them involving high-tech firms, that involve aftermarkets and other derivative markets.

Plaintiff PhantomALERT, Inc. (PhantomALERT) alleged that Defendant Apple, Inc. (Apple) had market power in the smartphone market (the foremarket), the Apple App Store, and the market for COVID-tracing apps on the iPhone (the aftermarkets). PhantomALERT brought, *inter alia*, claims under Section 2 of the Sherman Act, asserting that Apple tied iPhone users' access to apps via the App Store and monopolized the aftermarket for Covid-19-related tracing apps for use in the United States in the App Store. The tying product was the iPhone; the tied products were both the App Store and the Covid-19-related tracing apps.

2

Apple filed a motion to dismiss, arguing that PhantomALERT failed to allege a relevant market, including a single-brand market as defined by the Supreme Court in *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451 (1992), and that PhantonAlert was required to show the *Epic* factors—including, for example, that consumers in the foremarket are not aware of the aftermarket restrictions, face high information and switching costs, and are locked-in—in order to prevail on its antitrust claims. Op. at 12 (citing *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 977 (9th Cir. 2023)).

Rather than oppose the motion, PhantomALERT filed a motion to amend its complaint, attaching the amended complaint. Apple filed a reply in support of its motion to dismiss asserting that the case should be dismissed because amendment was futile for failure to allege either a plausible relevant market or monopoly power. Reply at 4, 12.

The district court agreed with Apple and denied PhantomALERT's motion to amend its complaint, finding that PhantomALERT had failed to adequately define a "*Kodak*-style aftermarket … to the smartphone foremarket." Op. at 13. In so finding, the district court held that "consumer lock-in is the crux of any *Kodak*-style theory." *Id.* at 14; *see also id.* at 16 ("[T]here have not been any credible assertions that consumers are 'locked in'[.]") (citing *Epic Games*, 67 F.4th at 976) (additional citations omitted).

The district court erred. *Kodak* applies to claims of aftermarket monopolization only where the defendant lacks market power in the foremarket, not where, as in this

case, the defendant has market power in the foremarket. The district court's view, if broadly accepted, would significantly cut back on antitrust liability where it is most needed.

## ARGUMENT

Sections 1 and 2 of the Sherman Act forbid monopolists to exploit their market power in one market to stifle competition in another market. The reason is that consumers in the second market are harmed when competition is reduced or eliminated. *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶¶ 652c, 1706 (2025). For example, a prima facie tying case consists of showing that the defendant has market power over one product (the "tying" product) and conditions sales of that product on customers' purchasing another product (the "tied" product) from it. Market or monopoly power in a primary market may similarly allow the defendant to impose exclusive dealing requirements, or otherwise obtain or maintain a monopoly, in a second market such as would support a Section 1 exclusive dealing claim or a Section 2 monopolization claim regarding the second market.

In many such cases, the first market (or "foremarket") consists of durable goods, and the second market (the "aftermarket") consists of goods (such as parts or attachments) or services (such as repair) that are necessary to maintain, use, or derive maximum value from the foremarket good. "An aftermarket is a type of derivative market consisting of consumable goods or replacement components that must be

4

used for the proper functioning of some primary good." *Id.* ¶ 564b. Under Sections 1 and 2, a plaintiff can make a prima facie case by showing that the defendant has market power over the foremarket goods and uses that market power in the foremarket to exclude competitors from the aftermarket. This theory is a straightforward application of traditional antitrust principles and is not treated in the case law as a distinctive source of antitrust liability, but *amici* call it the "foremarket theory" here to distinguish it clearly from the lock-in theory.

There is an alternative way for a plaintiff to prevail on a claim that a company has reduced competition in an aftermarket. This theory, unlike the first, is available where the defendant does *not* have market power in the foremarket. According to the "lock-in theory," a defendant who faces competition in the foremarket may incur liability for excluding competitors in an aftermarket derived from demand for the defendant's foremarket product when consumers of the defendant's foremarket product had no reason to expect that such exclusion would take place, among other requirements. *See Kodak*, 504 U.S. at 472–77.

The two theories are separate and independent ways of establishing liability. PhantomALERT chose to advance the first theory. However, the court ruled against PhantomALERT, holding that amending its complaint was futile because it had not alleged the facts necessary to satisfy the second theory. This was plainly an error. The Court of Appeals should reverse the trial court and eliminate the confusion reflected

in the trial court's decision by explaining the different requirements of the two theories.

## I.    THE FOREMARKET THEORY

The foremarket theory is simply an application of the standard doctrinal framework underpinning tying, exclusive dealing, and monopolization cases. As noted above, tying consists of exploiting market power over a "tying" product to require purchasers to also purchase a "tied" product from the defendant, thereby reducing competition in the tied market. Similarly, a plaintiff makes out a prima facie section 2 case by showing that the defendant has obtained or maintained monopoly power in one market through "anticompetitive," "exclusionary," or "predatory" conduct enabled by its monopoly in another market. The foremarket theory recognizes that market power over a foremarket product may give a defendant the ability to profitably suppress competition in a related aftermarket through tying, exclusive dealing, or other anticompetitive conduct affecting the aftermarket. Importantly, the defendant can exercise that power regardless of whether its customers are aware of the defendant's aftermarket behavior when they make their foremarket purchase—the defendant's power comes directly from its market power in the foremarket, not from its customers' ignorance or confusion. That's why there's no "lock-in" requirement associated with the foremarket theory.

While antitrust law allows firms to obtain monopolies as a reward for innovation, it prohibits firms from using a monopoly in one market to suppress

competition in a second market. To understand why, suppose that a firm has a monopoly over drug A, which it sells to hospitals. The firm also manufactures drug B in a competitive market where other firms also produce drug B. In monopolized market A, the firm can lawfully charge monopoly prices at the expense of consumers and reap monopoly profits. The law permits monopoly pricing of drug A as a reward for inventing drug A. In competitive market B, the firm cannot charge monopoly prices because if it were to raise the price, the hospitals would simply buy drug B from other sellers. To prevent that from happening, the firm tells the hospitals that if they want to buy drug A from it, they must also buy all their needs for drug B from it, rather than from competing sellers of drug B. If drug A is important enough to the hospitals, the hospitals will stop buying drug B from the firm's competitors in the drug B market. Instead, they will buy drug B from the firm in question. Now the firm has two monopolies rather than just one, and it can raise prices for drug B as well as maintain its monopoly price for drug A. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984) (describing the elements of a tying claim). An academic consensus supports liability in such cases for this reason. *See, e.g.*, Patrick Rey & Jean Tirole, *A Primer on Foreclosure*, 3 Handbook of Industrial Organization ch. 33 (Armstrong & Porter, eds. 2007); Areeda & Hovenkamp, *supra*, ¶ 1704b2.

The effect of gaining control of a second or adjacent market is sometimes called "foreclosure" because firms that might otherwise sell drug B to the hospitals are foreclosed from doing so. The mechanism for foreclosing the market for drug B is

7

tying in the example above, though other mechanisms—like exclusive dealing—can be used as well. Foreclosure is harmful because the firm that engages in foreclosure converts a competitive market into a monopoly, enabling it to raise prices in that market. To prevail on a tying claim against the firm, a plaintiff must prove that the firm had market power over drug A and that it used the tie to exclude competition for drug B. If the plaintiff cannot prove that the firm had market power over drug A, it will lose the case.

This example does not involve an aftermarket, but the principles are exactly the same. Now suppose that product A is a medical device and that product B consists of parts, attachments, or service. If the defendant has a monopoly over the medical device, which it obtained through innovation, it is entitled to charge a monopoly price for that device. But the defendant is not permitted to use its monopoly over the foremarket medical device to suppress competition in the aftermarket. That would permit the defendant to charge higher prices in the aftermarket where it has not innovated, causing injury to consumers. The Sherman Act thus gives the customers (as well as competitors in the aftermarket) a claim against the defendant for suppressing competition in the aftermarket.

A recent opinion in the Northern District of California illustrates these principles. In *Lambrix v. Tesla, Inc.*, 737 F. Supp. 3d 822, 834–35 (N.D. Cal. 2024), consumers sued Tesla for monopolizing the aftermarkets for replacement parts and repair services by requiring some of its suppliers to supply parts exclusively to Tesla

8

and interfering with the ability of independent service providers to service Tesla automobiles. The plaintiffs alleged both a foremarket theory and a lock-in theory. *Id.* at 841. The court denied the motion to dismiss on the basis of both theories. *Id.* The plaintiffs could proceed to trial on the foremarket theory because they sufficiently alleged that Tesla had market power in the electric vehicles market and used the power to monopolize the parts and repair aftermarkets. *Id.* While the court also held that the plaintiffs adequately alleged the lock-in theory, the foremarket theory was sufficient on its own. *Id.*

## II.     THE LOCK-IN THEORY

The lock-in theory is different from the foremarket theory because the lock-in theory does not require the defendant to have market power in the foremarket. The theory was recognized in the Supreme Court's *Kodak* case, and has been addressed in other cases such as *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023).

In *Kodak*, a group of companies that repair photocopiers sued Kodak for tying the sale of parts for Kodak-branded copiers to service of those copiers and monopolizing the aftermarket for service of those copiers. 504 U.S. at 459. The plaintiffs argued that Kodak monopolized the service aftermarket by blocking sales of Kodak parts to the plaintiffs and in other ways interfering with the ability of the plaintiffs to service Kodak machines. *Id.* at 458.

Kodak argued that even if it had a monopoly share of the parts aftermarket, it did not have market power in that aftermarket and thus could not raise prices above the competitive level in either the parts or the service aftermarkets. *Id.* at 465–66. The

reason, Kodak argued, is that the buyers of copiers (in the foremarket) take into account downstream costs of maintenance and repair (in the aftermarkets). This is known as lifecycle pricing: the customers estimate the price of the Kodak copier over its entire lifecycle, thus summing the retail price at the time of purchase and the present value of the expected price of maintenance and repairs for the useful life of the copier. *Id.* Kodak argued that, if it raised aftermarket prices, then the buyers would demand a discount in the foremarket so as to offset the additional expected downstream costs. *Id.* at 469–70. Otherwise, they will buy copiers from Kodak's competitors rather than from Kodak. *Id.* But because the foremarket is competitive, Kodak already sells copiers at the competitive price; if it reduces the price, it will lose money. Kodak thus argued it could not raise prices in the aftermarket without losing customers in the foremarket. *Id.* at 472. In short, Kodak argued, it is impossible for a firm that faces foremarket competition to monopolize the aftermarket.[2] *Id.* at 469–70.

The Supreme Court rejected the argument. The Court explained that

> Kodak's claim that charging more for service and parts would be "a short-run game," . . . is based on the false dichotomy that there are only two prices that can be charged—a competitive price or a ruinous one. But there could easily be a middle, optimum price at which the increased revenues from the higher priced sales of service and parts would more than compensate for the lower revenues from lost equipment sales. The fact that the equipment market imposes a restraint on prices in the aftermarkets by no means disproves the existence of power in those markets.

---

[2] For a discussion of the lock-in theory in *Kodak*, see Steven C. Salop, *The First Principles Approach,* Kodak*, and Antitrust at the Millennium*, 68 Antitrust L.J. 187 (2000).

*Kodak*, 504 U.S. at 470–71. In certain conditions, Kodak can raise the aftermarket price without lowering the foremarket price by locking in foremarket customers who are unable to accurately estimate the lifecycle price. In *Epic*, the Ninth Circuit enumerated the factors that a plaintiff must prove to proceed under *Kodak*'s lock-in theory where the defendant lacks power in the foremarket: (1) consumers in the foremarket must not generally be aware of the aftermarket restrictions; (2) consumers cannot price the aftermarket restrictions accurately because of significant information costs; (3) the cost of switching to a different brand in the foremarket is high; and (4) the aftermarket is itself a well-defined market. *Epic*, 67 F.4th at 977.

The lock-in theory says that a firm without market power in the foremarket can achieve market power in an aftermarket. The *Kodak* court said this was possible because consumers who are unaware of aftermarket restrictions and are unable to engage in lifecycle pricing will make purchases in the foremarket without being able to take account of the consequences of their choice. 503 U.S. 473–76. Kodak can then surprise them with a change of conduct—for example, as in *Kodak* itself, driving competitors from the aftermarket and then raising prices. The customer cannot simply switch to another brand of copier—perhaps because copiers are expensive or staff have been trained with Kodak machines or Kodak machines interoperate with other business equipment owned by the customer. *Id.* at 476–77. PhantomALERT was not required to satisfy the lock-in conditions in order to prevail.

## III.   WHY IT MAKES NO SENSE TO COMBINE THE THEORIES

The lower court appears to believe that the factors that must be satisfied for the lock-in theory must also be satisfied for the foremarket theory. That is a mistake.

11

If Kodak had had a monopoly over copiers, then plaintiffs would have prevailed under the foremarket theory, and would not have been required to satisfy the *Kodak/Epic* conditions for lock-in.[3] Imagine, for example, that customers could perfectly engage in lifecycle pricing, so that the lock-in theory does not apply. If Kodak had a foremarket monopoly over copiers, then the customers would know that Kodak could also obtain a monopoly over service by refusing to sell parts to the repair companies. Knowing this, the customers could in principle calculate the lifecycle price of the copier. But having done so, they would not be able to purchase a different copier brand with a lower lifecycle price because there is no other copier brand. In this scenario, Kodak's use of foremarket power to monopolize the aftermarket causes an antitrust injury to consumers because of the reduction of competition in the aftermarket, enabling Kodak to raise aftermarket prices. The consumers' capacity to engage in lifecycle pricing does not protect them from the antitrust injury.

By applying the lock-in conditions to the foremarket theory, the district court has turned the lock-in theory on its head. The lock-in theory *expanded* antitrust liability by applying it to defendants without foremarket power who lock in their customers. That is why Justice Scalia, in his *Kodak* dissent, complained that the majority's opinion

---

[3] The Court explicitly recognized that Kodak did not have monopoly power in the foremarket. *Kodak*, 504 U.S. at 465 & n.10.

"threatens to release a torrent of litigation." *Kodak*, 504 U.S. at 489. By contrast, the

district court in the present case *contracted* antitrust liability by immunizing defendants

with foremarket power who exercise their market power with means other than lock-

in. The district court's mashup of lock-in and foremarket power violates settled

antitrust principles and common sense. Neither the Supreme Court nor any court of

appeals has ever taken this position.

## CONCLUSION

For the foregoing reasons, *amici* respectfully request that this Court reverse the

district court's denial of amendment of the complaint as futile for failure to allege a

relevant market.

Dated: July 23, 2025                    Respectfully submitted,

                                        By:    */s/ Deborah A. Elman*
                                               Deborah A. Elman
                                               Bruce E. Gerstein
                                               GARWIN GERSTEIN & FISHER LLP
                                               88 Pine Street, Suite 2810
                                               New York, NY 10005
                                               T: (212) 398-0055
                                               delman@garwingerstein.com
                                               bgerstein@garwingerstein.com

                                               *Counsel for* Amici Curiae *Professor Eric A.*
                                               *Posner and the American Antitrust Institute*

13

## CERTIFICATE REGARDING SEPARATE BRIEF

Pursuant to D.C. Circuit Rule 29(d), I certify that this separate *amicus* brief is necessary because it provides it provides unique insights regarding the application of antitrust and competition principles that the court below misunderstood and misapplied. Because *amici* are not aware of any other *amicus* brief addressing these issues, it certifies pursuant to D.C. Circuit Rule 29(d) that joinder in a single brief with other *amici* would be impracticable.

*/s/ Deborah A. Elman*
Deborah A. Elman

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts exempted by Fed. R. App. P. 32(f), the brief contains 3,206 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(b) because the brief has been prepared in Microsoft Word, using 14-point Garamond font, a proportionally spaced typeface.

/s/ Deborah A. Elman
Deborah A. Elman

## CERTIFICATE OF SERVICE

I certify that on July 23, 2025, I caused the foregoing Corrected Brief of *Amici Curiae* to be filed through this Court's CM/ECF system, which will serve a notice of electronic filing on all counsel for the parties.

/s/ *Deborah A. Elman*
Deborah A. Elman